J-A29038-24

2025 PA Super 97

| | | |
|---|---|---|
| G.NORMAN MCCANN, G. NORMAN MCCANN IRREVOCABLE SPOUSAL TRUST, G. NORMAN MCCANN IRREVOCABLE TRUST FOR DAVID O. MCCANN, G. NORMAN MCCANN IRREVOCABLE TRUST FOR N. JEFFREY MCCANN, G. NORMAN MCCANN IRREVOCABLE TRUST FOR GREGORY K. MCCANN, G. NORMAN MCCANN IRREVOCABLE TRUST FOR PAUL B. MCCANN, G. NORMAN MCCANN IRREVOCABLE TRUST FOR TIMOTHY D. MCCANN, G. NORMAN MCCANN IRREVOCABLE TRUST FOR KAREN JAMIESON, THE 2017 DAVID O. MCCANN FAMILY TRUST, THE 2017 N. JEFFREY MCCANN FAMILY TRUST, THE 2017 GREGORY K. MCCANN FAMILY TRUST, THE 2017 PAUL B. MCCANN FAMILY TRUST, THE 2017 TIMOTHY D. MCCANN FAMILY TRUST, AND THE 2017 KAREN JAMIESON FAMILY TRUST. | : : : : : : : : : : : : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br>No. 82 WDA 2024 |
| Appellants<br> v. | : : : : : : | |
| SMB INVESTMENTS, LLC, TDWJR INVESTMENTS, LLC, RICHARD W. TALARICO, AND HJP ACQUISITION LP. | : : : : : : : : | |

Appeal from the Order Entered December 15, 2023
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  Case No. GD-21-001332


BEFORE:  OLSON, J., LANE, J., and BENDER, P.J.E.

J-A29038-24

OPINION BY BENDER, P.J.E.:                    **FILED:  May 6, 2025**

Appellants, G. Norman McCann ("Norman"), G. Norman McCann Irrevocable Spousal Trust, G. Norman McCann Irrevocable Trust for David O. McCann, G. Norman McCann Irrevocable Trust for N. Jeffrey McCann, G. Norman McCann Irrevocable Trust for Gregory K. McCann, G. Norman McCann Irrevocable Trust for Paul B. McCann, G. Norman McCann Irrevocable Trust for Timothy D. McCann, G. Norman McCann Irrevocable Trust for Karen Jamieson, The 2017 David O. McCann Family Trust, The 2017 N. Jeffrey McCann Family Trust, The 2017 Gregory K. McCann Family Trust, The 2017 Paul B. McCann Family Trust, The 2017 Timothy D. McCann Family Trust, and The 2017 Karen Jamieson Family Trust,[1] purport to appeal from the trial court's December 15, 2023 orders granting summary judgment in favor of Appellees, SMB Investments, LLC, TDWJR Investments, LLC, Richard W. Talarico, and HJP Acquisition LP, and denying Appellants' motion for summary judgment.[2]  After careful review, we are constrained to vacate and remand.

_____

[1] We refer to the trusts collectively as "Trusts."

[2] Norman is deceased but still listed in the caption of this appeal.  For the reasons set forth below, we determine that his personal representatives must be properly substituted in his place.  For ease of discussion, we refer to Norman and the Trusts collectively as "Appellants."

- 2 -

In Appellants' second amended complaint, they alleged the following facts in pertinent part.[3]  Each of the Trusts were established on behalf of Norman and his family.  *See* Second Amended Complaint, 12/1/22, at ¶ 15.  A primary asset in each of the Trusts is shares of common voting stock ("Stock" or "Pledged Stock") in The Bantry Group Corporation ("Bantry"), which is a holding company that owns 100% of the capital stock of Wexford Health Sources, Inc. ("Wexford").  *Id.* at ¶ 16.  Wexford provides medical services to inmates in prisons and jails throughout the United States, and is the only operating entity of Bantry.  *Id.* at ¶¶ 24-25.  Richard Talarico, Thomas Wright, and Henry Posner, Jr. originally owned the Stock; Posner is the predecessor in interest of Appellee HJP Acquisition, and Wright is the predecessor in interest of Appellees SBW Investments and TDWJR Investments.  *See id.* at ¶ 33.[4]

By way of background, in 2003, Wexford was an economically distressed company, and Norman — who had previously retired from Bantry — returned to Bantry and assumed primary control of Wexford.  *Id.* at ¶¶ 27-29.  At that time, Appellees sold the Stock to Norman under a Stock Purchase Agreement.  *Id.* at ¶¶ 33-34.  Norman's purchase of the Stock was financed through a

---

[3] Norman and the Trusts were represented by the same attorneys below and submitted joint filings.  The record indicates that Norman's son — N. Jeffrey McCann — had a general durable power of attorney for Norman.

[4] To facilitate and simplify our discussion, we refer to Appellees and/or their predecessors (if any) as "Appellees."  We recognize, however, that Posner and Wright are not parties to this action.

Promissory Note in the principal amount of $7.55 million, with Appellees as payees. *Id.* at ¶ 35. Norman and Appellees also entered into an Additional Consideration Agreement ("ACA") pursuant to which Norman agreed to pay one-half of certain defined distributions to Appellees. *Id.* at ¶ 36. In addition, Appellees and Norman entered into a Stock Pledge Agreement to secure Norman's obligations arising out of the Promissory Note and the amounts called for in the ACA. *Id.* at ¶ 37. In total, Appellees sold all their voting stock in Bantry to Norman, and they took a security interest in the Stock. *Id.* at ¶ 38. The Stock Purchase Agreement, Promissory Note, ACA, and Stock Pledge Agreement are collectively referred to as the "Operative Agreements."

After Norman returned and assumed primary control of Wexford, Wexford enjoyed a turnaround and a sustained period of success that allowed Appellees to be paid the full amount of the Promissory Note, plus compounded interest of approximately $2.5 million. *Id.* at ¶¶ 40, 44. Furthermore, between 2003 and the time the second amended complaint was filed, Appellees received more than $40 million pursuant to the ACA. *Id.* at ¶ 44.

Under the Stock Pledge Agreement, Norman agreed not to transfer all or any part of his right, title, and interest in and to the Stock so long as any of the obligations remain outstanding. *Id.* at ¶ 46. Accordingly, in 2017, he requested and received Appellees' consent to gratuitously transfer a portion

of the Stock to the Trusts. *Id.* at ¶ 47.[5] Subsequently, in 2020, Norman again requested Appellees' consent to gratuitously transfer more of the Stock for estate and management planning purposes. *Id.* at ¶ 48. This time, however, Appellees refused to consent, and instead issued a comprehensive written information request, dated August 12, 2020, to Norman. *Id.* at ¶ 49.[6]

In December of 2020, Gleason & Associates, P.C. ("Gleason") completed an independent business valuation of the fair market value of Bantry, which included its subsidiary Wexford. *Id.* at ¶¶ 53-54. Appellees were notified that Appellants intended to sell the Stock based on the Gleason valuation and that the Operative Agreements would be terminated after Appellees received one-half of the purchase price for the Stock. *Id.* at ¶ 55. In response, Appellees insisted that their consent is needed to sell the Stock, and that a sale of the

_____

[5] Though not mentioned in the second amended complaint, Appellants also advance that, "in late 2004, [Norman] sought, and received, [Appellees'] consent to transfer some of his [Stock] to his family's [T]rusts." Appellants' Brief at 17-18 (citation omitted). They further explained that Appellees' consent for the transfers was given "in exchange for the execution, by the [T]rusts, of [j]oinder [a]greements making the [T]rusts parties to the [p]ledge (which, of course, incorporates the ACA and the [Stock] Pledge Agreement)." Appellants' Brief at 55 (citations omitted).

[6] The August 12, 2020 information request sought various documents for the seventeen-year annual periods ending from December 31, 2003 through December 31, 2019, including, *inter alia*, schedules of all shareholder distributions; computations of shareholder federal and state income tax liabilities on Bantry's taxable income supporting shareholder distributions; schedules of Bantry's stockholders' equity; schedules of compensation of any kind paid to Bantry's shareholders, officers, and directors; schedules of certain expense reports; and schedules of legal, accounting, and other professional fees incurred. *See* Second Amended Complaint at Exhibit E.

Stock based on the Gleason valuation without Appellees' consent would constitute bad faith and a breach of the ACA and Stock Pledge Agreement. *Id.* at ¶ 56. Appellees also obtained their own valuation. *Id.*

Appellants filed their initial complaint on February 17, 2021. The operative second amended complaint was later filed on December 1, 2022.[7] Therein, they alleged that Appellants are the current owners of the Stock, and they sought a declaratory judgment pursuant to the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541, that there are no remaining obligations under the Operative Agreements, that the Operative Agreements are terminated, and that Appellants own the Stock free and clear. *Id.* at ¶¶ 80-81, 84, 87. They claimed that the Operative Agreements have been satisfied, that no obligations remain outstanding, and that the Operative Agreements are terminated based upon: (i) the terms of the Operative Agreements, which contain no termination provision or duration clause; (ii) Appellees' refusal to consent and their belief that the Operative Agreements entitle them to a perpetual stream of income; (iii) Appellees' conduct at every step to not end the relationship unless all of their demands are met; and (iv) the circumstances under which Appellees acquired their interest under the Operative Agreements and the fact that Appellees have received over $50

---

[7] At the time Appellants filed the second amended complaint, they indicated that there was no longer a proposed sale of the Stock based on the Gleason valuation. *See* Second Amended Complaint at ¶ 63.

million for a business that was in dire circumstances when Norman returned to run it in 2003. *Id.* at ¶ 77.

Appellees subsequently filed an answer, new matter, and counterclaim. Therein, *inter alia*, they denied that all obligations under the Operative Agreements have been satisfied, and asserted that Appellants have demonstrated through their course of conduct that obligations remain outstanding, including payment to Appellees of 50% of the proceeds of any sale of Bantry. *See* Answer, New Matter, and Counterclaim, 1/13/23, at ¶ 44; *see also id.* at ¶ 58 (claiming that Appellants "have consistently taken the position that only the sale of Bantry would terminate the [Operative Agreements] and, therefore, the sale of Bantry and payment of … 50% … of the proceeds to [Appellees] is a still-outstanding [o]bligation") (original brackets and quotation marks omitted). Appellees admitted that Appellants requested consent to transfer a portion of the Stock in 2017 and 2020, and that they gave consent for the 2017 transfer but did not give consent to the 2020 transfer. *Id.* at ¶¶ 47-49. Further, they averred that the Gleason valuation undervalued Bantry by more than $50 million, and that Appellants intended to sell the Stock to Bantry affiliates, Bantry's existing management, and/or Appellants' family members. *Id.* at ¶¶ 103, 104. Appellees additionally claimed that, pursuant to the Stock Pledge Agreement, they are entitled to copies of all financial statements, copies of annual financial statements, and such other financial, operational, and other information they may reasonably request, along with any material information regarding any

transaction involving the capital structure or assets of Bantry or any of its subsidiaries or the Collateral that is likely to occur in the next six months. *Id.* at ¶¶ 109-10.[8]

Appellees' counterclaim sought declaratory and injunctive relief. In count I of Appellees' counterclaim, they requested that the court declare that (a) Appellants are barred by the Pledge Agreement from selling or transferring any of the Stock without first obtaining Appellees' consent; (b) any sale or transfer of Appellants' interest in the Stock without first obtaining Appellees' consent is a breach of the Operative Agreements, as well as Appellants' duties of good faith and fair dealing with respect to the Operative Agreements; and (c) it is reasonable for Appellees to withhold consent to any proposed sale or transfer of the Stock for below fair market value and that any such sale constitutes a breach of Appellants' duties of good faith and fair dealing. *Id.* at ¶ 126. In the alternative, Appellees requested that the court order the sale of the Stock and/or Bantry on the open market, in lieu of Appellants' attempt to effectuate a non-arm's length, self-serving sale of the company for far below fair market value. *Id.* at ¶ 127. In count II, they requested that the court declare that, among other things, Appellees are entitled to all documentation concerning any proposed sale and the documents requested in their August 12, 2020 information request. *Id.* at ¶ 137. Appellees also asked the court to direct Appellants to produce the information it had asked

---

[8] Collateral is defined in the Stock Pledge Agreement and includes the Stock.

for in the August 12, 2020 information request, and all material information related to the proposed sale based on the Gleason valuation. *Id.*

On September 15, 2023, both parties filed motions for summary judgment and briefs in support. On November 7, 2023, both parties filed briefs in opposition.

On December 15, 2023, the trial court filed two orders: one order denied Appellants' motion for summary judgment, and the second order granted Appellees' motion for summary judgment.[9] In more detail, with respect to Appellees' motion for summary judgment, the trial court entered summary judgment in favor of Appellees and against Appellants in connection with count I of Appellants' complaint, stating that the Operative Agreements remain in force and effect, and that Appellees continue to be entitled to receive 50% of any distributions in Bantry, as the term "Distributions" is defined in the Operative Agreements, including, but not limited to, 50% of the proceeds resulting from any sale or transfer of Appellants' Stock. Order, 12/15/23, at ¶ a. With respect to count I of Appellees' counterclaim, the trial court granted summary judgment in favor of Appellees, determining that "[b]efore being permitted to transfer or sell any portion of their interest in Bantry, [Appellants]

_____

[9] Though these orders were dated December 14, 2023, notice pursuant to Pa.R.Civ.P. 236 was not given until December 15, 2023. *See* Pa.R.A.P. 108(b) ("The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the date on which the clerk makes the notation in the docket that written notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b).").

are required by the [Operative] Agreements to receive [Appellees'] express, written consent to do so." *Id.* at ¶ b. Regarding count II of Appellees' counterclaim, the trial court granted summary judgment in favor of Appellees, declaring that Appellants are required to provide Appellees with certain financial documents relative to Bantry. *Id.* at ¶ c.

On January 10, 2024, Appellants filed a notice of death pursuant to Pa.R.Civ.P. 2355, indicating that Norman passed away. *See* Pa.R.Civ.P. 2355 ("If a named party dies after the commencement of an action, the attorney of record for the deceased party shall file a notice of death with the prothonotary. The procedure to substitute the personal representative of the deceased party shall be in accordance with Rule 2352."); *see also* Pa.R.Civ.P. 2352 ("The successor may become a party to a pending action by filing of record a statement of the material facts on which the right to substitution is based. … If the successor does not voluntarily become a party, the prothonotary, upon praecipe of an adverse party setting forth the material facts shall enter a rule upon the successor to show cause why the successor should not be substituted as a party.").

On January 12, 2024, Appellants filed a timely notice of appeal.[10] The trial court directed Appellants to file a Pa.R.A.P. 1925(b) concise statement, and they timely complied on February 2, 2024.

_____

[10] As mentioned *supra*, Norman was listed in the caption of the notice of appeal, even though he had passed away by this time.

On June 7, 2024, Appellants filed with the trial court an "Unopposed Motion to Substitute N. Jeffrey McCann and Paul B. McCann in their Capacity as Personal Representatives of the Estate of G. Norman McCann, deceased, for G. Norman McCann." Therein, Appellants represented that Norman died on October 6, 2023, which is when the parties were litigating their summary judgment motions and prior to the trial court's entry of its summary judgment orders. Appellants said that letters of administration were issued to N. Jeffrey McCann and Paul B. McCann appointing them as personal representatives of the estate of Norman on April 18, 2024. Pursuant to Rule 2352, Appellants stated that Norman should no longer be a party to this action and should be replaced by N. Jeffrey McCann and Paul B. McCann in their capacity as personal representatives of his estate. In addition, they requested the trial court correct the case caption.

That same day, on June 7, 2024, the trial court granted Appellants' motion and amended the caption to reflect the requested substitution. The trial court later issued an opinion pursuant to Pa.R.A.P. 1925(a), dated July 10, 2024.[11]

---

[11] The case caption in the trial court's Rule 1925(a) opinion does not reflect the requested substitution. The Rule 1925(a) opinion also does not mention Norman's death.

Appellants raise five questions for our review in their brief.[12]  Prior to addressing these questions, we *sua sponte* raise whether the trial court had subject matter jurisdiction to enter the summary judgment orders with respect to Norman.

This Court has explained:

Subject matter jurisdiction relates to the competency of the individual court to determine controversies of the general class to which a particular case belongs.  It is never too late to attack a judgment or decree for want of jurisdiction.  That question is always open.  The want of jurisdiction over the subject matter may be questioned at any time.  It may be questioned either in the trial court, before or after judgment, or for the first time in an appellate court, and it is fatal at any stage of the proceedings, even when collaterally involved….  Moreover, it is well settled that a judgment or decree rendered by a court which lacks jurisdiction of the subject matter or of the person is null and void….  The question of subject matter jurisdiction may be raised at any time, by any party, or by the court *sua sponte*.  Because jurisdiction is a pure question of law, our standard of review is *de novo*, and our scope of review is plenary.

*In re Navarra*, 185 A.3d 342, 347-48 (Pa. Super. 2018) (cleaned up).

In **Grimm v. Grimm**, 149 A.3d 77 (Pa. Super. 2016), *disapproved on other grounds by* **Marion v. Bryn Mawr Trust Co.**, 288 A.3d 76 (Pa. 2023), this Court considered whether a trial court possesses subject matter jurisdiction over claims pending against a defendant when the defendant dies during the litigation and no personal representative is substituted in his or her

_____

[12] The parties' appellate briefs contain captions reflecting the requested substitution of Norman's personal representatives.  The Trusts, and the personal representatives requested to be substituted for Norman, have the same counsel on appeal and filed a joint brief.

- 12 -

place. There, a grandfather allegedly struck his grandson in the face with a shovel handle. According to the grandson, his grandmother had encouraged the grandfather to act violently towards his family members and refused to help the grandfather with his mental health. In addition, the grandson said that the grandfather's attorney had told the grandfather he could do whatever he wanted because of his age. The grandson subsequently initiated an action against the grandfather, grandmother, and attorney. The grandmother and attorney filed preliminary objections, which the trial court sustained on October 6, 2011. The claims against the grandfather remained pending. On May 16, 2013, the grandfather died. No notice of death was filed and no personal representative was substituted for the grandfather. On March 23, 2015, the grandfather's counsel filed a motion seeking a judgment of *non pros*. On May 11, 2015, the trial court granted the motion and entered a judgment of *non pros* as to the claims asserted against the grandfather. The grandson appealed.

On appeal, the grandson challenged the trial court's grant of the judgment of *non pros* with respect to the claims asserted against the grandfather, as well as the trial court's sustaining the grandmother's and attorney's preliminary objections. With respect to the grandfather, the **Grimm** Court held that "the death of a party deprives the trial court of subject matter jurisdiction over litigation by or against the deceased until such time as the deceased's personal representative is substituted in his or her place." *Id.* at 84. It stated that, under Rules 2352 and 2355, "the filing of a notice

of death and the substitution of a personal representative is mandatory." ***Id.*** Further, it observed that "this Court and our Supreme Court have repeatedly used the terms 'null' and 'void' when discussing the effect of a filing after a party dies." ***Id.*** at 85 (citations omitted). It also noted that other jurisdictions have likewise determined that the death of a party divests a court of subject matter jurisdiction. ***See id.*** at 86 n.9 (citing ***Vapnersh v. Tabak***, 131 A.D.3d 472, 473 (N.Y.App.Div. 2015) ("The death of a party divests the court of jurisdiction and stays the proceedings until a proper substitution has been made pursuant to [New York's equivalent of Rules 2352 and 2355.] Moreover, any determination rendered without such substitution will generally be deemed a nullity.") (internal quotation marks and citations omitted)).

Based on the foregoing, the ***Grimm*** Court concluded that the trial court lacked subject matter jurisdiction over the grandson's claims against the grandfather at the time that the trial court entered the judgment of *non pros* in favor of the grandfather. Because the trial court lacked subject matter jurisdiction over the grandson's claims against the grandfather at the time it entered the judgment of *non pros*, the ***Grimm*** Court vacated the judgment of *non pros* and remanded the matter to the trial court to either dismiss the cause of action for want of jurisdiction or to permit substitution of a personal representative.[13]

---

[13] In doing so, the ***Grimm*** Court acknowledged that its
*(Footnote Continued Next Page)*

Turning to the case *sub judice*, Norman died on October 6, 2023. At the time the trial court entered its summary judgment orders on December 15, 2023, no notice of death had been filed and no personal representative had been substituted in Norman's place pursuant to Rules 2352 and 2355. The notice of death was not filed on Norman's behalf until January 10, 2024. The substitution of Norman's personal representatives did not occur until June 7, 2024.

***Grimm*** and its progeny make clear that "the death of a party deprives the trial court of subject matter jurisdiction over litigation by or against the deceased ***until such time*** as the deceased's personal representative is substituted in his or her place." ***Grimm***, 149 A.3d at 84 (emphasis added). ***See also Witherspoon v. McDowell-Wright***, 241 A.3d 1182, 1186 (Pa. Super. 2020) (stating that, if the appellee "had passed prior to the entry of judgment in this matter, the trial court would have been without subject

---

holding appears to create a perverse incentive for defense counsel to not file a notice of death and to not timely substitute a personal representative in place of a deceased defendant. We note, however, that the Pennsylvania Rules of Civil Procedure provide adequate safeguards against such abuse. If defense counsel is aware of his or her client's death and fails to file a timely notice of death, he or she has breached his or her obligation under Rule 2355 and the trial court may impose appropriate sanctions. If defense counsel fails to timely substitute a personal representative, the plaintiff(s) may use the procedure set forth in Rule 2352(b) to obtain the necessary substitution.

***Grimm***, 149 A.3d at 90 n.17.

matter jurisdiction to proceed further until a personal representative had been appointed in her place"); ***Cholewka v. Gelso***, 193 A.3d 1023, 1033 (Pa. Super. 2018) ("Pursuant to the dictates of ***Grimm***, we conclude the trial court herein had no subject matter jurisdiction to enter summary judgment in favor of [the decedent] after a notice of his death was filed, and no personal representative was substituted in his place."); ***In re Navarra***, 185 A.3d 342, 349 (Pa. Super. 2018) ("Pursuant to ***Grimm***, the [o]rphans' [c]ourt lost subject matter jurisdiction over the claim against [the decedent] at the time of her death, and we lack jurisdiction to rule on this appeal to the extent it relates to [the decedent].") (citation omitted); 2 Standard Pa. Practice 2d § 12:31 ("[T]he death of a party to an action pending in a trial court temporarily deprives the trial court of subject matter jurisdiction over litigation—by or against the deceased—until such time as the deceased's personal representative is substituted in the deceased party's place.") (footnote omitted). Because the death of a party deprives the trial court of subject matter jurisdiction over claims by and against the deceased party, "[c]ounsel for the deceased party should file the notice of death ***promptly*** upon learning of the death of the party and serve a copy upon every other party to the action." *Note*, Pa.R.Civ.P. 2355 (emphasis added).

In the case *sub judice*, because no personal representative was substituted in Norman's place at the time the trial court entered its December 15, 2023 orders, we are compelled to conclude that the trial court lacked subject matter jurisdiction to enter the orders with respect to Norman. In

reaching this determination, we recognize that — in contrast to the circumstances in **Grimm** — Norman's personal representatives eventually sought substitution in the trial court while the appeal was pending before this Court. However, this subsequent request for substitution does not alter the fact that, at the time the trial court entered its orders disposing of the parties' summary judgment motions, Norman was deceased, and substitution had not yet occurred.[14]

Further, once the notice of appeal was filed in January of 2024, the trial court did not have the authority to grant the substitution in June of 2024. **See** Pa.R.A.P. 1701(a) ("Except as otherwise prescribed by these rules, after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter."); **Wishnefsky v. Evans**, No. 2021 MDA 2018, unpublished memorandum at 11-12 (Pa. Super. filed May 24, 2019) (citing, *inter alia*, Rule 1701(a) in rejecting the appellant's argument that the appellees' counsel was required to file a notice of death in the trial court where the trial court's order granting summary judgment in favor of the appellees was entered when all parties were alive and the appellant filed his notice of appeal prior to the death)[15];

---

[14] Given that no notice of death had been filed when the trial court entered its summary judgment orders, it is likely that the trial court did not know of Norman's death at the time of its disposition.

[15] **See** Pa.R.A.P. 126(b) (stating that an unpublished non-precedential memorandum decision of the Superior Court filed after May 1, 2019, may be cited for its persuasive value).

*see also* Pa.R.A.P. 502 (addressing the substitution of parties in the appellate court)[16]; ***but see Jones v. McGreevy***, 270 A.3d 1, 8 (Pa. Super. 2022) (recounting that the debtor's counsel filed a notice of debtor's death and a request to substitute in the trial court after the notice of appeal had been filed, and that "[t]he prothonotary adjusted the caption accordingly"; however, a review of the appellate docket in that case shows that this Court also granted

---

[16] Specifically, Rule 502(a) provides:

> If a party dies after a notice of appeal or petition for review is filed or while a matter is otherwise pending in an appellate court, the personal representative of the deceased party may be substituted as a party on application filed by the representative or by any party with the prothonotary of the appellate court. The application of a party shall be served upon the representative in accordance with the provisions of Pa.R.A.P. 123. If the deceased party has no representative, any party may suggest the death on the record and proceedings shall then be had as the appellate court may direct. If a party against whom an appeal may be taken or a petition for review may be filed dies after entry of an order below but before a notice of appeal or petition for review is filed, an appellant may proceed as if death had not occurred. After the notice of appeal or petition for review is filed, substitution shall be effected in the appellate court in accordance with this paragraph. If a party entitled to appeal or petition for review shall die before filing a notice of appeal or petition for review, the notice of appeal or petition for review may be filed by his personal representative, or, if he has no personal representative, by his counsel, within the time prescribed by these rules. After the notice of appeal or petition for review is filed, substitution shall be effected in the appellate court in accordance with this paragraph.

Pa.R.A.P. 502(a).

- 18 -

an application to substitute the administratrix of the debtor's estate for debtor on June 7, 2021).[17, 18]

_____

[17] We also note that the appellant in **Jones** filed a praecipe for the entry of judgment a few weeks after the appellee's death, stating that more than 120 days had passed since the filing of the appellant's motion for post-trial relief and the trial court had not yet disposed of the motion. The appellant in **Jones** subsequently appealed from the judgment, and this Court addressed his claims, even though the praecipe for judgment was filed after the appellee's death but before the appellee's notice of death was filed and personal representative was substituted. In contrast to the praecipe for judgment filed by the appellant in **Jones** in which the trial court was not disposing of the outstanding post-trial motion, the trial court in the case *sub judice* entered the summary judgment orders from which Appellants appealed. Thus, we deem **Jones** distinguishable, and it does not convince us to depart from **Grimm's** holding.

[18] Rule 1701(a) does not apply to interlocutory appeals taken as of right from an order granting an injunction. **See** Pa.R.A.P. 311(h) ("Pa.R.A.P. 1701(a) shall not be applicable to a matter in which an interlocutory order is appealed under subdivisions … (a)(4) of this rule."); Pa.R.A.P. 311(a)(4) (stating, subject to some exceptions inapplicable here, that an appeal may be taken as of right from an order that grants an injunction). While Appellees stated that they were seeking declaratory and injunctive relief in their counterclaim, we do not view the trial court's order as granting an injunction for the following reasons.

First, with respect to count I of Appellees' counterclaim, Appellees sought — in the alternative to their request for declaratory judgment — that the court "order or direct the sale of the Pledged Stock and/or Bantry on the open market." Appellees' Answer, New Matter, and Counterclaim at ¶ 127. However, the trial court's order — though claiming to grant count I in its entirety — did not direct that the Stock and/or Bantry be sold on the open market. Instead, the trial court declared that "[b]efore being permitted to transfer or sell any portion of their interest in Bantry, [Appellants] are required by the [Operative] Agreements to receive [Appellees'] express, written consent to do so." Order, 12/15/23, at ¶ b. Further, in litigating the summary judgment motion, Appellees requested a declaration from the trial court with respect to count I of their counterclaim. **See** Appellees' Brief in Support of Motion for Summary Judgment, 9/15/23, at 21 (Appellees' arguing for

*(Footnote Continued Next Page)*

declaratory relief, not an injunction, by asserting "[c]ount I of [Appellees']
[c]ounterclaim, requesting a declaration from the [c]ourt that [Appellees']
consent is required before [Appellants] can transfer, sell, or assign any of their
pledged interest in Bantry…, should be granted"); *see also id.* at 1 ("This
action involves three claims for declaratory judgment concerning the
interpretation of the [Operative Agreements] between the parties.  In this
[m]otion, [Appellees] request that the [c]ourt determine that they are entitled
to judgment as a matter of law in connection with all three claims in this
case."); *id.* at 2 ("Count I of [Appellees'] [c]ounterclaim requests a declaration
from the [c]ourt that [Appellees'] consent is required before [Appellants] can
transfer, sell, or assign any of their [Stock] in Bantry."); *id.* at 14 (repeating
that Appellees are requesting declaratory relief).

Second, regarding count II, Appellees requested — in addition to
declaratory relief — that the court direct Appellants to produce all information
and documentation that they requested in the August 12, 2020 information
request, as well as all material information and documentation related to the
proposed sale of the Stock based on the Gleason valuation.  *See* Appellees'
Answer, New Matter, and Counterclaim at ¶ 137; *see also id.* at ¶ 135.  Again,
though the trial court claimed to grant count II in its entirety, it did not order
Appellants to make available this information to Appellees.  Rather, it declared
that Appellants are required by the Operative Agreements to provide Appellees
with certain financial documents relative to Bantry, namely all monthly
financial statements on a monthly basis as exemplified in Exhibit "N" to
Appellees' motion for summary judgment; all audited annual financial
statements on an annual basis; all specific and detailed information
concerning any transaction involving a proposed sale of the Stock and/or
Bantry that is likely to occur within the six month period; and such other
financial, operational, and other information as Appellees may reasonably
request.  *See* Order, 12/15/23, at ¶ c.  Moreover, when litigating the summary
judgment motion, Appellees argued for declaratory relief with respect to count
II of their counterclaim.  *See* Appellees' Brief in Support of Motion for
Summary Judgment at 23 (Appellees' arguing for declaratory relief, not an
injunction, by stating that "[c]ount II of [their] [c]ounterclaim, requesting a
declaration that [Appellants] must make the financial disclosures set forth in
its attached proposed order…, should be granted"); *see also id.* at 2 ("Count
II of [Appellees'] [c]ounterclaim requests a declaration from the [c]ourt that
[Appellants] must make the financial disclosures set forth in [the] attached
proposed order of [c]ourt."); *id.* at 14-15 (reiterating that Appellees are
seeking declaratory relief).  Accordingly, we view the trial court's order as
granting declaratory relief to Appellees, not an injunction.

Based on the foregoing, we are constrained to conclude that the trial court's December 15, 2023 orders are null and void with respect to Norman. The trial court entered them at a time when it did not have subject matter jurisdiction over claims by or against Norman, given that he was deceased and no substitution of a personal representative had occurred at that point. We strictly apply **Grimm's** holding that the death of a party deprives the trial court of subject matter jurisdiction over litigation by or against the deceased until such time as the deceased's personal representative is substituted in his or her place.[19]  Accordingly, we vacate the trial court's December 15, 2023

_____

[19] We recognize the time and expense the parties have expended in litigating this appeal.  We also acknowledge that this Court has 'regarded as done that which ought to have been done' in other contexts. **See, e.g., Johnston the Florist, Inc. v. TEDCO Const. Corp.**, 657 A.2d 511, 514-15 (Pa. Super. 1995) (*en banc*) (stating that, although an appeal from an order denying post-trial motions is interlocutory, appellate courts may regard as done that which ought to have been done where the failure to enter judgment was the result of mere oversight); **Commonwealth v. Carter**, 122 A.3d 388, 391 (Pa. Super. 2015) (conveying that, even though the clerk failed to note service on the docket, the defendant obviously received the court's order because he filed an appeal less than 30 days later; "[a]ccordingly, we will regard as done that which ought to have been done and treat the appeal … as timely, *i.e.*, treat this appeal as if the [c]lerk inscribed the date of service on the docket on February 26, 2014") (cleaned up); **Vertical Res., Inc. v. Bramlett**, 837 A.2d 1193, 1199 (Pa. Super. 2003) ("[I]n the interest of judicial economy, we will regard as done what should have been done and consider the [Pa.R.Civ.P. 236] notice as having been mailed.  The appeal is not untimely, and it would be a waste of judicial resources to remand the matter solely for the filing of a [Rule] 236 notice.").

Here, however, we do not deem it appropriate to do so.  Initially, it does not appear that a breakdown in court operations caused the notice of death to be filed, and the substitution to be sought, after the entry of the trial court's summary judgment orders.  Rule 2355 directs that the attorney of record for
*(Footnote Continued Next Page)*

orders as they relate to Norman and remand this matter to the trial court to permit proper substitution of his personal representatives in his place.[20]

We next consider whether the loss of jurisdiction over the claims by and against Norman deprived the trial court of jurisdiction over the claims by and against the remaining Trusts. **See In re Navarra**, 185 A.3d at 349. This Court has explained that, in general,

> an indispensable party is one whose rights are so connected with the claims of the litigants that no decree can be made without

_____

the deceased party (*i.e.*, Norman's attorney) shall promptly file a notice of death upon learning of the death of the party, **not** the trial court. **See** Pa.R.Civ.P. 2355; **see also** Note, Pa.R.Civ.P. 2355. Further, we do not view the lack of substitution at the time the trial court entered its summary judgment orders as a procedural misstep we can simply overlook, given our case law and the implications for the court's subject matter jurisdiction. **See, e.g.**, **Grimm**, **supra**. In addition, allowing a case to proceed without proper substitution or dismissal of a deceased party is a problematic precedent to set, as it may result in prejudice to a deceased party's heirs or legatees, and impermissibly cause an attorney who was representing a deceased party to have no client in the ongoing litigation. **See Gilberti v. Payne**, 331 A.2d 158 (Pa. 1975) (Pomeroy, J., dissenting) (discussing similar considerations). Finally, we reiterate that "[i]t is never too late to attack a judgment or decree for want of jurisdiction. That question is always open." **In re Navarra**, 185 A.3d at 348 (citation omitted). Thus, even if we regarded as done that which ought to have been done and were to overlook the timing of Norman's substitution because no party is presently challenging it on appeal, there is a risk that the trial court's orders could be attacked later. **Id.** (stating that "[t]he want of jurisdiction over the subject matter may be questioned at any time[,]" and "a judgment or decree rendered by a court which lacks jurisdiction of the subject matter or of the person is null and void") (citations omitted).

[20] It is unclear why Norman's notice of death was filed over three months after his passing. However, on remand, it may be appropriate for the trial court to consider imposing sanctions for this belated notice. **See Grimm**, 149 A.3d at 90 n.17.

- 22 -

impairing its rights. Appellate courts have consistently held that property owners are indispensable parties in lawsuits concerning the owners' property rights.

The absence of an indispensable party goes absolutely to the court's jurisdiction. If an indispensable party is not joined, a court is without jurisdiction to decide the matter. The absence of an indispensable party renders any order or decree of the court null and void. The issue of "the failure to join an indispensable party" cannot be waived.

*Id.* (citation omitted).

To determine whether a party is indispensable, a court must consider:

1. Do absent parties have a right or interest related to the claim?

2. If so, what is the nature of that right or interest?

3. Is that right or interest essential to the merits of the issue?

4. Can justice be afforded without violating the due process rights of absent parties?

*Campanaro v. Pa. Elec. Co.*, 656 A.2d 491, 493 (Pa. Super. 1995) (citation omitted). *See also* 42 Pa.C.S. § 7540(a) ("When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding."); *City of Phila. v. Com.*, 838 A.2d 566, 581-82 (Pa. 2003) ("[W]e note the general principle that, in an action for declaratory judgment, all persons having an interest that would be affected by the declaratory relief sought ordinarily must be made parties to the action.") (citation omitted); *Mains v. Fulton*, 224 A.2d 195, 196 (Pa. 1966)

("[D]eclaratory judgment proceedings will not lie unless all the parties having an interest in the issue are joined.") (citations omitted).

Here, at the time of his death, Norman and the Trusts each owned a portion of the Stock. Appellants sought a declaratory judgment that the Operative Agreements are terminated, and that Appellants own the Stock free and clear. Appellees, on the other hand, sought declarations that Appellants are barred by the Stock Pledge Agreement from selling or transferring any of the Stock without first obtaining Appellees' consent, and that Appellees were entitled to receive certain financial information about Bantry from Appellants. Norman had a right or interest related to these claims, as an owner of the Stock. The relief requested by Appellees would require that Appellees receive certain financial information regarding Bantry and would affect how the Stock may be sold or transferred. Thus, we conclude that Norman was an indispensable party and that, because the trial court lacked subject matter jurisdiction over Norman at the time it entered its orders, it did not have jurisdiction to enter the summary judgment orders with respect to the Trusts.[21] Accordingly, we are constrained to vacate the trial court's orders as they relate to the Trusts as well.

_____

[21] We recognize that Norman and the Trusts were represented by the same attorneys throughout the litigation below and made filings jointly, and that the record indicates that Norman's son had a general durable power of attorney for Norman. As such, it could be argued that Norman's interests were represented despite his death. Nevertheless, the fact that Norman was deceased and his personal representative had not been substituted in his place

*(Footnote Continued Next Page)*

Orders vacated.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  5/6/2025

---

while the summary judgment motions were being litigated, and at the time the trial court entered its orders, remains problematic, as a decedent cannot be a party to an action.  **See Grimm**, 149 A.3d at 84-85 (relating that "[a] dead man cannot be a party to an action, and any such attempted proceeding is completely void and of no effect") (citation omitted).